# EXHIBIT B

## Commonwealth of Massachusetts

BRISTOL, ss.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 20-cv-00024

_____ Christy Callahan _____, PLAINTIFF(S),

v.

_ Merz North America, Inc. _, DEFENDANT(S)

## SUMMONS

THIS SUMMONS IS DIRECTED TO _ Merz North America, Inc. _. (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the _Bristol Superior_ Court.
**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1.  **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2.  **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
    a.  Filing your **signed original** response with the Clerk's Office for Civil Business, _ Superior _ Court, 441 County Street, 1st Floor, New Bedford, MA 02740 (address), by mail or in person, **AND**
    b.  Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Suzanne L Herold, Herold Law Group, P.C., 50 Terminal St, Bld 2, Ste 7LL, Charlestown, MA 02129,

3.  **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov.courts/case-legal-res/rulesofcourt.

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br><br>2073CV00624 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>Callahan, Christy L vs. Merz North America, Inc | Marc J. Santos, Clerk of Court<br>Bristol County |
|---|---|
| TO:  Merz North America, Inc<br>6501 Six Forks Road<br>Raleigh, NC 27601 | COURT NAME & ADDRESS<br>Bristol County Superior Court - New Bedford<br>441 County Street, 1st floor<br>New Bedford, MA 02740 |

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

STAGES OF LITIGATION                           DEADLINE

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 12/16/2020 | |
| Response to the complaint filed (also see MRCP 12) | | 01/15/2021 | |
| All motions under MRCP 12, 19, and 20 | 01/15/2021 | 02/16/2021 | 03/16/2021 |
| All motions under MRCP 15 | 01/15/2021 | 02/16/2021 | 03/16/2021 |
| All discovery requests **and depositions** served and non-expert depositions completed | 07/14/2021 | | |
| All motions under MRCP 56 | 08/13/2021 | 09/13/2021 | |
| Final pre-trial conference held and/or firm trial date set | | | 01/10/2022 |
| Case shall be resolved and judgment shall issue by | | | 09/19/2022 |

**The final pre-trial deadline is not the scheduled date of the conference.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED<br><br>09/17/2020 | ASSISTANT CLERK<br><br>Dina Swanson | PHONE<br><br>(508)996-2051 |
|---|---|---|

Date/Time Printed: 09-17-2020 11:38:04

SCV026\ 08/2018

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

PLAINTIFF(S): _Christy L. Callahan_

ADDRESS: _3 Washburn St._

_Norton, MA_

COUNTY _Bristol_

DEFENDANT(S): _Merz North America, Inc._

ATTORNEY: _Suzanne L. Herold, Herold Law Group, P.C._

ADDRESS: _50 Terminal St._

_Bld 2, Ste 716_

_Charlestown, MA 02129_

ADDRESS: _6501 Six Forks Rd_

_Raleigh, NC_

BBO: _675808_

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| _B22_ | _Employment Discrimination_ | _F_ | ☒ YES ☐ NO |

**\*If "Other" please describe:**

Is there a claim under G.L. c. 93A?
☐ YES ☐ NO

Is this a class action under Mass. R. Civ. P. 23?
☐ YES ☐ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ............................................................................................... $_____
2. Total doctor expenses ................................................................................................. $_____
3. Total chiropractic expenses ......................................................................................... $_____
4. Total physical therapy expenses .................................................................................. $_____
5. Total other expenses (describe below) ......................................................................... $_____
Subtotal (A): $_____

B. Documented lost wages and compensation to date ........................................................... $ _75,000 +_
C. Documented property damages to date ............................................................................ $_____
D. Reasonably anticipated future medical and hospital expenses ........................................... $_____
E. Reasonably anticipated lost wages ................................................................................. $_____
F. Other documented items of damages (describe below) ...................................................... $_____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:          _T.B.D._

_Emotional distress_

TOTAL (A-F):$ _75,000 +_

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

TOTAL: $ _____

**Signature of Attorney/ Unrepresented Plaintiff: X**          Date:

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record:  X**          Date: _09-14-2020_

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.

SUPERIOR COURT
CIVIL ACTION NO.:

_____ )
CHRISTY L. CALLAHAN       )
                        )
   Plaintiff           )
                        )
       v.            )
                        )
MERZ NORTH AMERICA, INC.  )
                        )
   Defendant,       )
_____ )

## COMPLAINT AND JURY DEMAND

### Parties

1. The Plaintiff, Christy L. Callahan (hereinafter "Ms. Callahan" or "Plaintiff"), is an individual with an address of 3 Washburn Street, Norton, Bristol County, Massachusetts.

2. The Defendant, Merz North America, Inc. ("Merz" or "Defendant") is a for-profit company with a principal place of business located at 6501 Six Forks Road, Raleigh, Wake County, North Carolina.

### Facts

1. Ms. Callahan is a former sales representative for Merz. She worked in that position from March 2016 until her constructive termination in March 2020.

2. Ms. Callahan sold Xeomin neurotoxin, as well as Radiesse and Belotero, injectable dermal fillers specifically and only approved for use in the face. Nationally, Merz employs approximately 100 sales representatives for these particular products.

3. Neil Topkin ("Mr. Topkin") became Ms. Callahan's direct supervisor in April 2018. Mr. Topkin's title is Regional Director, Northeast.

4.  Initially, while Mr. Topkin adjusted to the position, he and Ms. Callahan enjoyed a professional relationship.

5.  However, as Mr. Topkin settled into his role, he began to discriminate against Ms. Callahan on the basis of her sex.

6.  In August 2018 Mr. Topkin began making "men versus women" comments in relationship to the sales team's numbers.

7.  Mr. Topkin repeatedly stated that he wanted the men on his team to achieve the President's Club numbers because the "girls" had done it last year.

8.  In fact, Mr. Topkin regularly called men "men" but called women "girls" – a derogatory and undercutting term to describe females in the workplace. In fact, when addressing his region as a whole, Mr. Topkin calls the group "guys".

9.  The sexist behavior towards sales representatives is consistent with the corporate culture of Merz as it applies to the other sales representatives selling Xeomin, Radiesse and Belotero.

10. Specifically, related to a client event that Ms. Callahan was asked to attend (by the client) in February 2019 Mr. Topkin stated, "Do you really think you are capable of sitting at a table with executive men? You won't bring any value to the conversation" or words to that effect.

11. On several occasions, Ms. Callahan complained that Mr. Topkin's remark insulted her.

12. Additionally, Mr. Topkin set the sales growth of the men in his region lower than the females, and specifically Ms. Callahan's.  This practice was consistent in each quarter from 2019 through Mr. Callahan's constructive termination in March 2020.

13. Setting lower expectations for the male sales representatives as consistent across the country in that time-frame and was not unique just to Mr. Topkin.

14. For example, a male sales representative in the South did not reach his goals for an entire year and was not disciplined or issued a Performance Improvement Plan.

15. For example, a male sales representative in the Midwest had much lower sales growth than Ms. Callahan that was presented during a national sales meeting. Despite having lower sales growth than Ms. Callahan, this individual was awarded membership on the President's Club which is an honor that comes with a promotion, benefits and perks.

16. Another male sales representative in New York, Jason (last name unknown) was told by Merz that his sales goals would be set low so that he could win Presidents Club and therefore be promoted.

17. In May 2019, Ms. Callahan complained to Mr. Topkin that she was being treated differently than her male colleagues. She specifically asked if there was a mistake with how high her goals were set and cited examples of potential issues. Both Ms. Callahan and other female colleagues inquired why their her male counterparts were goaled lower.

18. Mr. Topkin made no meaningful attempt to address Ms. Callahan's concerns. Instead, he called her attitude "negative" and told her not to ask questions.

19. Then, in July 2019 Mr. Topkin retaliated against Ms. Callahan by issuing her a Letter of Professional Concern ("Letter"). The contents outlined in the letter are nonsense, and Ms. Callahan has the support of her accounts / Merz's customers to support her.

20. In August 2019 Ms. Callahan complained to Kim Lobell ("Ms. Lobell") in Merz's Human Resource Department.

21. Ms. Lobell made no meaningful attempt to address Ms. Callahan's concerns. However, Ms. Lobell seemed to indicate that Merz was aware of Ms. Callahan's contributions. In September 2019 Ms. Lobell said to "disregard" the Letter issued to her by Mr. Topkin because the August 31st deadline referenced in the Letter had expired and Merz had issued no further consequences.

22. It is also evident that Mr. Topkin was setting Ms. Callahan up to fail given that in 2018 Ms. Callahan increased her sales by 44%, where the rest of the nation averaged only a 15% -17% increase. Ms. Callahan should have been in the contention for the Presidents Club, but for Mr. Topkin interfering with her receiving that award so the males on the team would be better positioned.

23. As a result, Ms. Callahan was unable to be promoted to a Senior Territory Manager, a position that would have come with a considerable raise, benefits and perks.

24. Furthermore, Ms. Callahan has had a female colleague complain to her that Mr. Topkin is combative with women but not with men.  In particular, the colleague stated that it is "every little thing" that Mr. Topkin takes issue with when it comes to his female sales representatives and colleagues.

25. At all relevant times, Mr. Topkin's daily, repeated unprofessional tone, dismissive nature overall negative conduct and palpable disdain for Ms. Callahan created a hostile work environment.

26. In September 2019, Ms. Callahan emailed Human Resources and stated that Mr. Topkin's conduct was going to lead her to a nervous breakdown. When Mr. Topkin found out, he stated to Ms. Callahan that his words would be viewed as "truth" because of his position in management.  Ms. Callahan felt intimidated and silenced.

27. In fact, Mr. Topkin had made similar statements about "lies" beginning in July and made other comments such as "This client is very high profile with many eyes on it. If anything goes south/if they don't sign the contract, it will be on you. I will not take the fall." On information and belief, Mr. Topkin did not intentionally intimidate and bully the men on his team.

28. In October 2019 Ms. Callahan formally complained to Merz about the gender discrimination.

29. Ms. Callahan is a disabled individual.  Specifically, she has anxiety.

30. Mr. Topkin and Merz's sex based discrimination and retaliation caused Ms. Callahan to experience intense symptoms of her anxiety, which spiraled into her need for a medical leave.

31. Therefore, in October 2019 Ms. Callahan communicated to Merz that she needed to take a medical leave of absence.

32. Thereafter, Merz provided Ms. Callahan the wrong contact information so that she was unable to take leave pursuant to the Family Medical Leave Act ("FMLA").  Instead, Ms. Callahan (mistakenly) filled out an application for Short Term Disability.

33. In October 2019 Ms. Callahan submitted paperwork for her leave of absence.

34. On October 4, 2019 Merz, through Mr. Topkin, issued Ms. Callahan a Performance Improvement Plan ("PIP") for alleged "poor communication".

35. Ms. Callahan emailed Human Resources about the Performance Improvement Plan as she had previously been told to disregard the letter of Professional Concern and put the situation behind her, given that the August deadline had come and gone.  Merz informed Ms. Callahan that Merz does not put anyone on a PIP for missing 1, 2 or even 3 quarters of goals.

36. Ms. Callahan did not receive a meaningful response to her concern about being placed on an unwarranted and further retaliatory PIP.

37. On October 7, 2019 Ms. Callahan began her leave of absence.

38. On October 10, 2019 Ms. Callahan again communicated to Human Resources her concerns about Mr. Topkin.  Ms. Callahan specifically requested that Merz investigate Mr. Topkin's lies, Ms. Callahan provided Merz with client phone numbers to verify some of these examples.

39. Again, Ms. Callahan received no meaningful response.

40. Due to being placed on the PIP just three days prior to the commencement of her leave, Ms. Callahan felt forced to work through her leave to hit her October sales targets, so as to comply with the metrics set forth in the PIP.

41. Merz was aware that Ms. Callahan was working during her medical leave for the specific purpose of saving her job and made no effort to intervene.  In fact, Human Resources seemed to encourage it.

42. Ms. Callahan was scheduled to be on medical leave until October 31, 2019.  On October 31, 2019 Ms. Callahan had met her monthly sales goal.

43. Between October 7, 2019 and October 31, 2019 Mr. Topkin and a male sales representative were caught in a scheme involving non-complaint training and other illegal / FDA non-complaint activity with multiple clients.

44. The Company did not terminate, or meaningfully discipline Mr. Topkin or the other male sales representative in any way.  However, Merz did reprimand the woman who reported the incident and forced her to apologize to Mr. Topkin.

45. Despite Merz providing her the wrong contact information for an FMLA leave, Cigna (Ms. Callahan's short term disability and FMLA coordinator) was able to approve Ms. Callahan's leave as FMLA versus short term disability.

46. Ms. Callahan was informed of this on or around October 21, 2019 by Nancy Mayer an employee in Merz's Benefits Department.

47. On Friday, November 1, 2019 Ms. Lobell informed Ms. Callahan that the FMLA paperwork for an extension to her leave was due from her primary care physician on Monday, November 4, 2019.

48. Cigna later informed Ms. Callahan to disregard Ms. Lobell's demand that the paperwork be submitted just three days later and stated that there was no set date for the updated paperwork to be submitted.

49. On November 8, 2019 Ms. Callahan was able to meet with her primary care physician who submitted paperwork to extend Ms. Callahan's leave through late December 2019.

50. On November 13, 2019 Cigna approved Ms. Callahan's request for extended leave.  Cigna communicated that Merz would be alerted the following day and that Ms. Callahan had no further obligation to do anything at that point.

51. On November 22, 2019 Ms. Lobell untimely and unlawfully requested that Ms. Callahan submit to a psychiatric evaluation by Merz's physician for a "second opinion".

52. On December 11, 2019 Ms. Lobell informed Ms. Callahan that Merz considered her on an "unapproved leave" since November 1, 2019 and threatened to terminate Ms. Callahan if she doesn't return to work by December 16, 2019.

53. Despite being on an approved leave until December 29, 2019, concerned about termination, Ms. Callahan returned to work on December 16, 2019 – without approval from her physician.

54. That same day, Mr. Topkin informed Ms. Callahan that she had a $110,000 sales goal for December with only 5 official work-days left in the month.

55. Merz also reinstated Ms. Callahan's PIP on December 16, 2019.

56. Ms. Callahan achieved her January sales goal, as required by the PIP, and finished the month with the second highest attainment in the nation.

57. Nevertheless, Ms. Callahan was not taken off the Performance Improvement Plan as she should have been and Mr. Topkin continued to create a hostile, threatening and intimidating work environment.

58. In fact, in early to mid-January 2020, Ms. Callahan received an e-mail that her Merz email address would be shut down in 2 weeks, which coincided with the date her PIP was set to expire.  Ms. Callahan informed the VP of Human Resources, who disregarded her concern.  Ms. Callahan called the IT Department who confirmed that someone within Merz intervened to keep her account open.

On information and belief, this is dispositive that Merz planned to terminate Ms.
Callahan regardless of her performance.

59. Furthermore, in February 2020 one of Ms. Callahan's clients informed her that
Merz sent an email indicating that Ms. Callahan was not their Injectibles contact
person and that Mr. Topkin would continue to be their day-to-day contact person.
When Ms. Callahan asked Mr. Topkin for a copy of the email, he refused to
provide it.

60. To that extent, on February 24, 2020 following a day of Mr. Topkin riding along
to Ms. Callahan's customer visits, Ms. Callahan's primary care physician
instructed her to make an emergency visit to Brigham & Women's Hospital where
she underwent several tests on her heart.

61. As a result, Ms. Callahan was forced to take another medical leave through March
18, 2020.

62. At that time, Ms. Callahan was scheduled 8 field rides with Mr. Topkin in a 3-4
week span.  Everyone else in her region was scheduled approximately 1.5 - 2
rides in 3 months.

63. Ms. Callahan was constructively terminated in early March 2020.

64. On information and belief, Mr. Topkin has sought to terminate or remove 4-5
other female colleagues  during Ms. Callahan's tenure – a number far higher than
men.

65. Prior to her constructive termination, Human Resources informed Ms. Callhan
that it had done a "thorough" investigation into her complains against Mr. Topkin
and had concluded there was no wrongdoing.  However, Human Resources did
not interview Ms. Callahan as part of this investigation, nor did they interview her
female colleagues who would verify her complaints.  Merz also made no effort to
speak to the clients that Ms. Callahan had provided contact information to call and
verify her complaints.

66. Throughout this time, Ms. Callahan was also aware that Mr. Topkin and other
higher level managers were engaging in illegal activity to increase their sales.

67. For example, Mr. Topkin regularly instructed sales representatives to promote /
market Radiesse for off-label use, such as use in the buttocks, which violates
federal protocols.

68. Mr. Topkin has asked a Merz trainer how much Radiesse she uses on clients in
the buttocks, while she is training.  It is prohibited for Merz to promote Radiesse
for use in the buttocks, which Mr. Topkin effectively did.  On one occasion, Mr.

Topkin encouraged the trainer to use more Radiesse in the buttocks in an attempt to increase profit to Merz.

69. Mr. Topkin has also promoted this representative (Jordon) to a Regional Field Trainer despite women in the group having higher numbers than Jordan.  On information and belief, Jordan was promoted over more qualified women because of his sex (male) and because of his willingness to promote Merz product for off-label use and engage in other prohibited activity.

70. At a regional meeting held in Connecticut in April 2019 Mr. Topkin had a sales representative present on how to use Radiesse in the buttocks (an area of the body that the Federal Drug Administration has not approved the use of).  After the presentation, the sales representative sent a text message to the region (including Ms. Callahan) about the presentation.  Thereafter, the team began being pressured and "encouraged" to promote this off-label use to grow sales of Radiesse.

71. Related to Ms. Callahan's sex discrimination claims, the representative who presented on product use in the buttocks also posted a photo of himself and other male members at the top of the Presidents Club list with the caption "Big dick power!"  A Merz executive was aware of the posting and made no effort to report the issue to Human Resources.

72. By January 2020 Ms. Callahan had retained legal counsel and had put the Company on notice of her anticipated legal claims.  As a direct result, the Company prohibited Ms. Callahan from attending the conference, which directly interfered with her ability to do her job, as the purpose of the conference is to learn, gather new information and strategize on how to increase sales.

73. On another conference call in Summer 2019 Mr. Topkin also instructed his team to promote Radiesse for use in the buttocks.  He specifically stated that clients needed to be informed of using the product in new places, despite the product only being approved by the FDA for use in the face.  Mr. Topkin instructed the team to fill out Medical Information Requests ("MIR") so that off-label information could be sent to doctors.

74. On information and belief, Merz is aware that Mr. Topkin is promoting off label use and has failed to intervene because it drives up sales. In fact, the representative who gave the presentation on use in the buttocks is projected to win Presidents Club for Merz's fiscal year ending June 2020 specifically because sales for off label use have increased dramatically.

75. Furthermore, while Merz is permitted to give away free samples for the purposes of training, Mr. Topkin has provided Merz's customers with unlawful free samples to use on patients for purposes other than training.  When Ms. Callahan asked how to address clients concerns about the legality of the free samples, Mr.

Topkin merely stated, "Clients can do whatever they want with samples, which is why Merz doesn't mark the samples to say 'sample'." As a result, they appear to be a paid product.

76. In fact, Mr. Topkin instructed and then pressured Ms. Callahan and other colleagues to sell 100 vials of Xeomin by sampling heavily. For instance, Mr. Topkin stated to provide a hiugh number of samples to secure a 100 vial order.

77. Many sales representatives, including Ms. Callahan, have objected to this practice both because it is unlawful and because it drives down her ability to sell the product.

78. On information and belief, Merz is aware that Mr. Topkin is giving away free samples for use other than training and demonstration and has failed to intervene because it keeps Merz's customers loyal, which in turn creates more sales.

79. In December 2019, while visiting clients, Mr. Topkin illegally told clients that their new prices for Xeomin was $275 and Radiesse was $135, via samples. This also violates FDA protocols.

80. Mr. Topkin has also engaged in forging doctor's signatures via remote sampling for Xeomin.

81. The proper protocol is that doctors (and not nurses or practice managers or anybody else) must sign for the request and receipt of the drug. However, Mr. Topkin engages in a practice of having customers forge the doctors' signatures.

82. In particular, one doctor in Ms. Callahan's territory, Dr. Edgar H.Ballenas, repeatedly had his signature forged. When he became aware of this practice, he complained that Merz was jeopardizing his medical license.

83. Ms. Callahan initially reported this improper conduct to Mr. Topkin in May 2019, and then again to Merz in January 2020. Ms. Callahan was told on both occasions that it was not a compliance issue and there was "no evidence" of forgery. However, Dr. Bellenas' records indicate otherwise. Furthermore, Dr. Bellenas was not aware of the samples associated with his license.

84. Furthermore, in February 2020, Ms. Callahan received an email from a client that she believed to be fraudulent. A company called "Pipeline Medical" was promoting a "Buy 5, get 2 free" and a "Buy 10, get 5 free" deal of Merz Injectables. In the United States, "buy-get" deals are prohibited. Ms. Callahan immediately forwarded the email to Mr. Topkin so he could forward it to Merz's legal department. Instead, Mr. Topkin refused to address the issue in writing and directed Ms. Callahan to Merz's Director of Strategic Accounts. As it turned out,

Pipeline Medical was a new partner of Merz and Merz was aware that Pipeline Medical was promoting free products directly with purchased products, as well as promoting non-FDA approved use of products.  The Director of Strategic Accounts later offered Ms. Callahan free samples so that she could fulfill her clients' inquiries as to how to take advantage of the promotion.

85. One day after Ms. Callahan reported the illegal "buy-get" campaign, she was placed on another Performance Improvement Plan with goals that were virtually impossible to achieve.

86. By this time, Ms. Callahan had hired legal counsel to help her navigate how to handle the illegal activity occurring within Merz and the blatant discrimination and retaliatory treatment she was receiving.  Ms. Callahan, through counsel, put Merz on notice of the illegal activities running rampant throughout the Company, including the existence of illegal Group Purchasing Organization ("GPO").

87. Ms. Callahan was not comfortable reporting any of this behavior to the Company's EAP Hotline, and instead chose to go through counsel, because she became aware of other incidents, including one where a colleague reported sexual harassment. In that case, instead of Merz performing an investigation, the complaint was leaked, the accused was promoted to a director level position and the women who learned of this activity was told she would lose her job if she repeated anything she had heard (related to the lack of confidentiality on the EAP line and the lack of investigation).

88. Ms. Callahan repeatedly complained about being instructed by Mr. Topkin to use these unlawful practices to sell.

89. Merz made no attempt to correct the issues.

90. Rather, Merz continued to retaliate against Ms. Callahan by setting her sales goals to knowingly unattainable numbers so that it could justify her termination.

91. Plaintiff has exhausted her administrative remedies with the Massachusetts Commission Against Discrimination.


## Causes of Action

(Each Cause Of Action Incorporates Therein
All Of The Paragraphs Set Forth, Hereinabove.)

## FIRST CAUSE OF ACTION – GENDER DISCRIMINATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

92. This is a cause of action against the Defendant for gender discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

93. The Plaintiff is a female.

94. The Defendant is aware that Plaintiff is a female.

95. The Defendant treated Ms. Callahan's male comparators more favorably than Plaintiff.

96. The Plaintiff was subjected to gender discrimination, which had the purpose of creating a hostile and humiliating work environment, which interfered with the Plaintiff's ability to do her job.

97. As a result, Plaintiff was terminated from the Defendant.

98. As a result of the Defendant's conduct, the Plaintiff has suffered damages.

## SECOND CAUSE OF ACTION – DISABILITY DISCRIMINATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

99.     This is a cause of action against the Defendant for gender discrimination in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

100.    The Plaintiff is a disabled individual.

101.    The Defendant is aware that Plaintiff is disabled.

102.    Plaintiff's disability interferes with major life functions such as working and sleeping.

103.    The Plaintiff was subjected to disability discrimination, which had the purpose of creating a hostile and humiliating work environment, which interfered with the Plaintiff's ability to do her job.

104.    Furthermore, the Defendant refused to properly engage in the interactive process with Plaintiff.

105.    Defendant dialed to provide Plaintiff a reasonable accommodation.

106.    As a result of her disability and / or need for a reasonable accommodation, Plaintiff was terminated from the Defendant.

107.   As a result of the Defendant's conduct, the Plaintiff has suffered damages.

### THIRD CAUSE OF ACTION – RETALIATION IN VIOLATION OF MASS. GEN. LAWS CHAPTER 151B §1, et. seq.

108.   This is a cause of action against the Defendant retaliation in violation of Massachusetts General Laws Chapter 151B § 1, et. seq.

109.   The Plaintiff complained to the Defendant about the ongoing gender and disability discrimination.

110.   As the result of her complaints to the Defendant, the Defendant increased its hostile behavior.

111.   The Plaintiff was subjected to retaliation, which had the purpose of creating a hostile and humiliating work environment, which interfered with the Plaintiff's ability to do her job.

112.   As a result, Plaintiff was terminated from the Defendant.

113.   As a result of the Defendant's conduct, the Plaintiff has suffered damages.

### FOURTH CAUSE OF ACTION – WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

114.   This is a cause of action against the Defendant for wrongful termination in violation of a public policy.

115.   Plaintiff refused to participate in illegal activities in order to generate business and profit for the Defendant.

116.   The Plaintiff complained to the Defendant that it was participating in illegal activities in order to generate business and profit for the Defendant.

117.   As the result of Plaintiff's refusal to participate in illegal activity, and because of her complaints that Defendant should not engage in the illegal conduct, the Defendant created a hostile work environment for Plaintiff.

118.   As the result of Plaintiff's refusal to participate in illegal activity, and because of her complaints that Defendant should not engage in the illegal conduct, the Defendant terminated Plaintiff.

119.    As a result of the Defendant's conduct, the Plaintiff has suffered damages.

## FIFTH CAUSE OF ACTION – VIOLATION OF THE FAMILY MEDICAL LEAVE ACT OF 1993, 29 U.S.C. CHAPTER 28

120.   This is a cause of action against the Defendant for violation of the Family Medical Leave Act

121.   Ms. Callahan suffered a serious health condition and/or conditions.

122.   Ms. Callahan worked at least 1,250 hours during the last 12 months and is otherwise covered under the FMLA.

123.   The Defendant employs 50 or more employees and is otherwise covered by the FMLA.

124.   The Defendant interfered with Ms. Callahan's right to take FMLA.

125.   As a result, Ms. Callahan has suffered damages.

## SIXTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT OF 1993, 29 U.S.C. CHAPTER 28

126.   This is a cause of action against the Defendant for retaliation in violation of the FMLA.

127.   The Defendant retaliated against the Plaintiff by giving her less favorable job assignments, interfering with her ability to perform her job duties and responsibilities, creating unrealistic and knowingly unattainable goals, creating an even more hostile and toxic work environment and treating her less favorably than similarly situated employees.

128.   The Defendant retaliated against Ms. Callahan by terminating her employment as a direct result of taking leave under the FMLA.

129.   As a result, Ms. Callahan has suffered damages.

*The Plaintiff demands a jury trial on all triable issues.*

WHEREFORE, the Plaintiff hereby requests that this Honorable Court grant the following relief:

1.   Judgment against the Defendant;

2.   Attorney's fees, costs and expert witness fees;

3.   Compensatory damages for emotional distress;

4.   Punitive damages pursuant to MGL c. 151B, § 9;

5.   Pre-Judgment and Post-Judgment Interest, and

6.   Such other relief as the Court deems just and fair.

September 14, 2020

The Plaintiff,
Christy L. Callahan,
By her attorney,

Suzanne L. Herold (BBO# 675808)
Herold Law Group, P.C.
50 Terminal Street
Building 2, Suite 716
Charlestown, MA 02129
(617) 336-7196 (t)
(617) 398-2730 (f)
suzie@heroldlawgroup.com

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                          SUPERIOR COURT
                                      CIVIL ACTION NO.: 20-cv-00624

_____
                                      )
CHRISTY L. CALLAHAN                   )
                                      )
        Plaintiff                     )
                                      )
           v.                         )
                                      )
MERZ NORTH AMERICA, INC.              )
                                      )
        Defendant,                    )
_____)

## ACKNOWLEDGMENT AND ACCEPTANCE OF SERVICE

        Service of Plaintiff's Complaint & Jury Demand, Copy of Summons, Tracking
Order and Civil Action Cover Sheet is hereby acknowledged and accepted by Defendant,
Merz North American, Inc.


        October 12, 2020              Defendant
                                      Merz North America, Inc.
                                      By its attorney,



                                       _/s/ Dana Rust_____
                                      Dana Rust, Esq.
                                      Heidi E. Siegmund, Esq.
                                      McGuire Woods LLP
                                      Gateway Plaza
                                      800 East Canal Street
                                      Richmond, VA 23219-3916
                                      (804) 775-1082
                                      drust@mcguirewoods.com
                                      HSiegmund@mcguirewoods.com